UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| CINDY BURTON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CIVIL ACTION NO. |
| VS. | ) | |
| | ) | 3:99-CV-0305-G |
| WYETH-AYERST LABORATORIES | ) | |
| DIVISION OF AMERICAN HOME | ) | **ECF** |
| PRODUCTS CORPORATION, ET AL., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Before the court are the defendant's motions to limit the testimony of the

plaintiff's generic experts and to exclude the expert testimony of Michael P. Elkin

("Elkin").  For the reasons stated herein, the motion to limit the testimony of the

generic experts is denied, and the motion to exclude the testimony of Elkin is granted

in part and denied in part.

## I.  BACKGROUND

This case stems from the ingestion by the plaintiff Cindy Burton ("Burton" or

"the plaintiff") of certain diet drugs manufactured by the defendant Wyeth-Ayerst

Laboratories ("Wyeth" or "the defendant").  Between 1996 and 1997, Burton was

prescribed and used two products manufactured by Wyeth -- Pondimin and Redux --

to combat obesity.  Burton claims that as a result of such use, she now suffers from

two ailments: heart valve regurgitation and pulmonary arterial hypertension ("PAH").

Originally filed in state court, the case was removed to this court in February 1999; in

October 1999, the Judicial Panel on Multidistrict Litigation ordered the case

transferred to the United States District Court for the Eastern District of

Pennsylvania for coordinated and consolidated pretrial proceedings.  The case

remained before the transferee court until August 2, 2006, when it was conditionally

remanded to this court.  Following a status conference and the entry of a scheduling

order, the instant motions, among others,[1] were filed.

## II.  ANALYSIS

### A.  Evidentiary Challenges Under *Daubert*

Both of the instant motions *in limine* seek to exclude proposed expert testimony

under FED. R. EVID. 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S.

579 (1993).  FED. R. EVID. 702 provides that a duly qualified individual may provide

opinion testimony as to "scientific, technical, or other specialized knowledge" if such

---

[1]     Also pending before the court are Wyeth's motion to exclude plaintiff's
expert testimony regarding pulmonary hypertension medical prognosis; Wyeth's
motion to exclude unreliable evidence that plaintiff's condition will progress or that
plaintiff will need heart valve surgery in the future; Wyeth's motion to exclude expert
testimony of causation; and Wyeth's motion for partial summary judgment.  These
motions will be resolved separately.

information "will assist the trier of fact to understand the evidence or to determine a fact in issue." According to the rule, such evidence is limited to testimony that is both based upon sufficient facts or data and is the product of reliable principles and methods. FED. R. EVID. 702. Furthermore, the expert witness must have applied the principles and methods reliably to the facts of the case. *Id.* These prerequisites to the admissibility of expert testimony have been applied as a two-part test: reliability and "fit." See *Daubert*, 509 U.S. at 590-91; FED. R. EVID. 702 advisory committee's note.

Following the Supreme Court's decision in *Daubert*, it is the duty of the trial court to serve a gatekeeping function, excluding from the jury unreliable or irrelevant expert testimony. *Daubert*, 509 U.S. at 589. Courts are to apply this gatekeeping function to all expert testimony, not just science-based expert testimony. *Kumho Tire Company, Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999); *Black v. Food Lion, Inc.*, 171 F.3d 308, 310 (5th Cir. 1999). To aid in the exercise of this gatekeeping function, the Supreme Court set forth a non-exhaustive list of factors for trial courts to consider: (1) "whether [the theory or technique] can be (and has been) tested"; (2) "whether the theory or technique has been subjected to peer review and publication"; (3) "the known or potential rate of error"; (4) "the existence and maintenance of standards controlling the [theory or] technique's operation"; and (5) whether the theory or technique has "general acceptance" within the scientific

community.  *Daubert*, 509 U.S. at 593-94; see also *Vargas v. Lee*, 317 F.3d 498, 500 (5th Cir. 2003).

Application of the *Daubert* factors and any other relevant factors used to determine the admissibility of expert testimony is left to the judgment of the trial court and reviewed only under an abuse of discretion standard.  *Vargas*, 317 F.3d at 500-01.  In determining the admissibility of expert testimony, the trial court is not to consider the conclusions generated by an expert witness, but only the principles and methodology used to reach those conclusions.  *Daubert*, 509 U.S. at 595.  When the principles and methodology are sufficient to allow the expert opinion to be presented to the jury, the party challenging the testimony must resort to "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof" as the means to attack "shaky but admissible evidence."  *Id.* at 596.

## B.  Motion to Limit Testimony of Plaintiff's Generic Experts

Wyeth challenges the admissibility of certain portions of testimony given by several of the plaintiff's generic expert witnesses.[2]  The defendant argues that the majority of the challenged testimony was previously deemed inadmissible by the transferee court; Burton, for her part, generally agrees with this assertion.  However, the transferee court left certain issues to be resolved in the discretion of this court.

_____

[2]        As part of the pretrial proceedings before the transferee court, the plaintiffs' liason committee retained several expert witnesses labeled as "generic witnesses" for the purpose of providing non-case-specific testimony.

- 4 -

Wyeth's motion asks this court to exclude testimony beyond the parameters of the various pretrial orders entered by the transferee court. Therefore, the court will address the challenges as to each of these generic experts separately.

1. *Testimony of Jerome L. Avorn, M.D.*

Dr. Jerome L. Avorn ("Avorn") is a medical doctor and pharmaco-epidemiologist. *See* Defendant Wyeth's Brief in Support of Its Motion to Limit Expert Testimony of Plaintiff's Generic Experts ("Motion to Limit Generic Experts") at 4. Wyeth seeks the exclusion of Avorn's testimony regarding (1) his opinion as to the thoughts and expectations of other physicians; (2) his reaction to documents discussing the Food and Drug Administration ("FDA") approval process for Redux; (3) his opinion as to how he would have processed certain adverse drug experience reports and his opinion regarding the intent of Wyeth based the manner in which it processed and investigated adverse drug experience reports; and (4) his reading of "various documents" into the record. See *id.*

Burton stipulates in her response to the motion that she will not call Avorn to testify regarding the expectations of other physicians or the FDA regulations. *See* Plaintiff's Brief in Support of Response to Defendant Wyeth's Motion to Limit the Testimony of Plaintiff's Generic Experts ("Response on Generic Experts") at 2; see also *In re Diet Drugs (Phentermine, Fenfluramine, Dexfenfluramine) Products Liability Litigation* ("PTO 1332"), MDL No. 1203, 2000 WL 876900, at *11 (E.D. Pa.

- 5 -

June 20, 2000) ("[A]lthough [Dr.] Avorn . . . [is] fully qualified within [his] specialt[y], that does not qualify [him] to speak as [an] expert[ ] in the field of the requirements of the federal regulations regarding labeling and warnings for FDA approved drugs.  In addition, . . . Dr. Avorn's qualifications do not qualify [him] to opine as [an] expert[ ] about what all doctors generally consider in making prescription decisions.").  PTO 1332 and Burton's stipulation resolve Wyeth's first two objections to Avorn's testimony and thus these objections are denied as moot.

As illustrated by PTO 1332, Avorn's testimony regarding how he would have treated the adverse drug experience reports and his opinion regarding the intent of Wyeth based on its handling of these reports concerns the corporate intent of Wyeth. The transferee court found Avorn's testimony regarding Wyeth's corporate intent to be inadmissible.  *See* PTO 1332, 2000 WL 876900, at * 9.  This court will not displace the ruling of the transferee court.  This court further reiterates the finding of the transferee court -- though Burton cannot introduce evidence of Wyeth's intent through this expert, she is not generally precluded from introducing evidence of Wyeth's intent.  See *id.*  Because the transferee court previously ruled on the issue of Avorn's testimony regarding the corporate intent of Wyeth, the motion to limit his testimony is denied as moot.

The final issue with regard to Avorn's testimony is whether he will be permitted to read "various documents" into evidence.  Wyeth argues that Avorn lacks

personal knowledge of the content of these documents and that Burton is merely "funnel[ing]" these documents through Avorn's expert testimony as a means to get the contents of those documents before the jury. *See* Motion to Limit Generic Experts at 7. When this argument was previously raised before the transferee court, it held, "Whether a particular document can be introduced through a witness as a basis for his expert opinion will, of course, be left to the trial judge in the transferor court." PTO 1332, 2000 WL 876900, at *8. The transferee court continued, stating that if a document in question is admitted into evidence, then the trial judge will likely allow the expert to discuss the document. *Id.* This court does not disagree with this uncontroversial decision of the transferee court. On the instant motion, Wyeth has done little to further its argument. This court cannot address the issue of whether Avorn can read from unnamed "various documents" until first determining the admissibility of these documents. Thus, while the court notes the defendant's objection to the use of this testimony, the court must deny the motion at this time.

Accordingly, Wyeth's motion to limit the testimony of Dr. Avorn is denied. Under the existing pretrial order, Avorn's testimony regarding his opinions as to the thoughts of other physicians, his reactions to the FDA documents, and his opinion regarding the intent of Wyeth has already been deemed inadmissible. Thus, the motion to exclude these portions of Avorn's testimony is denied as moot. To the extent that Wyeth moves to keep Avorn from reading "various documents" into the

record, the motion is denied.  However, the defendant shall have leave to reassert its

objection to Avorn's reading of the "various documents" at trial following a decision

by this court on the admissibility of the specific documents at issue.

None of the discussion in this section regarding Avorn's testimony should be

construed as limiting the areas of testimony found to be admissible in the transferee

court's PTO 1332.

> Dr. Avorn [is] fully qualified to opine on the medical facts
> and science regarding the risks and benefits of the diet
> drugs in question and to compare that knowledge with
> what was provided in the text of labeling and warnings on
> the diet drugs in question.  In other words, . . . [Dr.] Avorn
> [is] qualified to render an opinion as to the labels'
> completeness, accuracy, and -- it follows from that -- the
> extent to which any inaccuracies or omissions could either
> deprive a reader or mislead a reader of what the risks and
> benefits of the diet drugs in issue are or were at the time
> the labeling was published.

PTO 1332, 2000 WL 876900, at *11.

### 2.  *Testimony of Robyn J. Barst and Stuart Rich*

Dr. Robyn J. Barst ("Barst") is a medical doctor with expertise in the treatment

and diagnosis of primary pulmonary hypertension ("PPH").  *See* Motion to Limit

Generic Experts at 8.  Dr. Stuart Rich ("Rich") is an internist and cardiologist, with

expertise in the diagnosis and treatment of PPH.  *Id.* at 18.  Wyeth seeks to exclude

from evidence Barst's and Rich's testimony regarding (1) FDA regulations; (2) the

efficacy of prescribing Pondimin and Redux for the treatment of obesity; and (3) the

- 8 -

drug Aminorex (an anorexigen marketed in Europe in the 1960's that was determined

to cause PPH).  The plaintiff again stipulates in her response that she will not call

Barst or Rich to give expert testimony regarding the FDA regulations[3] and further

stipulates that she will not call on them to testify regarding the efficacy of prescribing

Pondimin and Redux.  *See* Response on Generic Experts at 4-5.  The transferee court

addressed both issues and found the testimony to be inadmissible.  See *In re Diet*

*Drugs (Phentermine, Fenfluramine, Dexfenfluramine) Products Liability Litigation*, ("PTO

1685"), MDL No. 1203, 2001 WL 454586 (E.D. Pa. Feb. 1, 2001) at *20, 21

(stating "testimony about whether the labels met regulatory standards is beyond the

expertise of both Drs. Barst and Rich.  Neither witness has anything more than

incidental experience with FDA regulations addressing the approval process for

labeling, the requisite content of labels, or any other issues concerning the propriety

of labeling as defined by FDA regulations" and "Drs. Barst and Rich are not qualified

to opine about the efficacy of Pondimin and Redux for treating obesity.").  Thus, the

court denies as moot Wyeth's motion regarding these two challenges.

     With regard to Barst's and Rich's testimony about Aminorex, the court will not

exclude such testimony.  The transferee court refused to exclude similar testimony

---

[3]     The plaintiff does note, however, that she may call Rich as a fact witness
to discuss his firsthand personal knowledge of the FDA.  *See* Response on Generic
Experts at 4 n.2; *In re Diet Drugs (Phentermine, Fenfluramine, Dexfenfluramine) Products
Liability Litigation*, MDL No. 1203, 2001 WL 454586, at *19 n.22 (E.D. Pa. Feb. 1,
2001).

about Aminorex proffered by Dr. Lewis J. Rubin.  *See* PTO 1332, 2000 WL 876900, at * 10.  Because "the Aminorex experience in the 1960's may support evidence of notice to the pharmaceutical community," the transferee court left the ultimate decision of the Aminorex testimony to the discretion of this court at trial.  *Id.*  Under Texas state law, when a plaintiff asserts a claim of negligence, notice can serve to establish the foreseeability of the harmful consequences alleged.  See *McCullough v. Godwin*, __ S.W.3d __, 2007 WL 431153, at *7 (Tex. App.--Tyler Feb. 9, 2007, no pet.).  Thus, the issue of notice goes to the threshold element of duty.  *Allright San Antonio Parking Inc. v. Kendrick*, 981 S.W.2d 250, 252 (Tex. App.--San Antonio 1998, no pet.).  Accordingly, testimony regarding Aminorex is admissible for the purpose of establishing notice to Wyeth.

Therefore, Wyeth's motion to limit the testimony of Barst and Rich is denied.  The motion is denied as moot with regard to Wyeth's challenge to their testimony about the FDA regulations and the efficacy of Pondimin and Redux.  As to their testimony regarding Aminorex, the motion is denied.  To the extent that this last challenge seeks to exclude causation testimony about Aminorex, the motion is denied as moot because the transferee court previously found such testimony to be inadmissible.  *See* PTO 1332, 2000 WL 876900, at *10.

In accordance with the order of the transferee court, this court concludes that Barst and Rich

- 10 -

are eminently qualified to "opine on the medical facts and science" regarding the risks of the diet drugs in question as such testimony relates to the risks of PH and PPH. . . . Thus, Drs. Barst and Rich may opine as to the labels' accuracy and the extent to which an inaccuracy or omission could either deprive or mislead a reader as to the risks of these diet drugs at the time the labeling was published.

\* \* \*

Clearly, testimony concerning the risk of PH and PPH from diet drugs is within the expertise of both of these experts.

PTO 1685, 2001 WL 454586, at *20-21 (internal citations omitted).

### 3.   *Testimony of Colin M. Bloor*

Dr. Colin M. Bloor ("Bloor") is a pathologist specializing in the cardiovascular and pulmonary systems.  Motion to Limit Generic Experts at 10.  Between 1998 and 1990, a Dr. Boivin conducted a study known as Study 1781 in which rats were exposed to dexfenfluramine (Redux) to study its effects.  *See* PTO 1685, 2001 WL 454586, at *4.  In March and July of 1999, Bloor used the slides from Study 1781 to conduct a separate study in which he visually observed portions of the exposed rats' hearts.  *Id.* at *11.  In his study, Bloor "recorded narrative descriptions of what he saw in each [slide]" and "organized those descriptions into verbal categories and collapsed and converted the categories into numerical scores."  *Id.*  Based on his observations, Bloor concluded that there was a statistically significant increase in cardiac fibrosis sufficient to notify Wyeth of the dangers of Redux when used by humans.  Motion to Limit Generic Experts at 10.

- 11 -

After a thorough *Daubert* analysis, the transferee court concluded that Bloor's testimony regarding the conclusions of his study -- that "the increased incidence and severity of myocardial fibrosis in the rat hearts was a strong signal that dexfenfluramine was cardiotoxic and warranted further testing" -- should be excluded. PTO 1685, 2001 WL 454586, at *16.  The court found Bloor's methodology to be unreliable.  *Id.* at *13.  Here, Burton does not dispute the transferee court's holding and this court sees no reason to stray from it.  However, Wyeth's motion asks this court to exclude *all* of Bloor's testimony, a position the transferee court was unwilling to adopt.

In PTO 1685, the transferee court stated it "perceive[d] no *Daubert* problem with testimony by Dr. Bloor that, based on his experience in cardiac pathology, the levels of and location of fibrosis reported by Dr. Boivin in Study 1781, if assumed to be accurate, warranted further investigation with regard to the potential of fenfluramines to cause cardiac fibrosis."  2001 WL 454586, at *16.  Thus, the transferee court found that testimony regarding the conclusions Bloor drew from *his study* were inadmissible, but his testimony regarding *Study 1781* itself was admissible. Again, Wyeth presents this court with no reason to deviate from the pretrial order.

Accordingly, the defendant's motion to limit the testimony of Bloor is denied.

4. *Testimony of John L. Gueriguian*

Dr. John L. Gueriguian ("Gueriguian") is a medical doctor, pharmacologist, endocrinologist, and chemist. *See* PTO 1685, 2001 WL 454586, at *5. From 1978 to 1998, he was employed by the Food and Drug Administration ("FDA"), where he "reviewed drugs for safety and efficacy; applied FDA regulations regarding labeling, postmarketing surveillance and approval of drugs; and participated to some extent in the drafting of those regulations." *Id.* The defendant moves to exclude Gueriguian's testimony regarding (1) the prescribing practices of physicians; (2) his opinions based on the excluded study conducted by Bloor; (3) his opinion regarding Wyeth's corporate intent; and (4) his personal beliefs about appropriate standards for pharmaceutical companies. *See* Motion to Limit Generic Experts at 12-13; Defendant Wyeth's Reply Brief in Support of Motion to Limit the Testimony of Plaintiff's Generic Experts ("Reply on Generic Experts") at 3. Wyeth contends that the transferee court has already excluded these areas of Gueriguian's testimony. *See* PTO 1685, 2001 WL 454586, at *18-19 ((1) "Dr. Gueriguian is not qualified to opine on what decisions would have been made by the numerous physicians who prescribed diet drugs had they been provided with different labeling information"; (2) "[b]ecause the court has already determined that Dr. Bloor's report is unreliable, any opinion by Dr. Gueriguian based upon that report is also unreliable and should be excluded"; and (3) "it is not an 'expert' opinion, but rather a personal opinion about what standards

- 13 -

Dr. Gueriguian believes should apply to pharmaceutical company conduct"). Again, Burton does not dispute the transferee court's holding and stipulates that she will not call Gueriguian to testify regarding the prescribing practices of physicians, Bloor's study, or Wyeth's corporate intent. *See* Response on Generic Experts at 6.

Burton asserts that she intends to call Gueriguian to testify not about these previously excluded matters but "about how information should be communicated to the FDA, what information should be reflected on labels as mandated by applicable regulations, and what reasonable FDA officials would do with adverse event information." Response on Generic Experts at 6. Upon review of PTO 1685, it appears that the transferee court has already addressed the admissibility of the evidence that the plaintiff intends to proffer through Gueriguian. *See* PTO 1685, 2001 WL 454586, at *18 (holding Gueriguian's testimony to be admissible "to the extent that Dr. Gueriguian opines about how information should be communicated to the FDA and what information should be reflected in labels, as mandated by applicable regulations, he is undoubtedly qualified to do so in light of his experience as an FDA officer" and "as to what a reasonable official in the position of Dr. Lutwak would have done"). Accordingly, his testimony shall be limited to the extent described in PTO 1685 and no further; the motion to limit Gueriguian's testimony is denied as moot.

5. *Testimony of Arthur Hull Hayes, Jr.*

Dr. Arthur Hull Hayes, Jr. ("Hayes") is a medical doctor and former commissioner of the FDA.  Motion to Limit Generic Experts at 13.  Wyeth seeks to exclude his testimony in three respects:  (1) where he opines about the corporate intent of Wyeth; (2) in which he reads "various documents and others' testimony"; and (3) where he uses the "non-regulatory term 'medically serious' in a regulatory context."  *Id*. at 14-16.  With regard to the first objection, Burton again concedes that she will not introduce testimony from Hayes regarding the corporate intent of Wyeth.  *See* Response on Generic Experts at 6.  The transferee court also excluded the testimony regarding the defendant's corporate intent.  *See* PTO 1685, 2001 WL 454586, at *2.  Thus, the first challenge is denied as moot.

As to the second point of contention, the court agrees with the transferee court -- the challenge to Hayes reading certain documents is co-extensive with the similar challenge made to Avorn's testimony.  See *id.*  Because here, as with Avorn, Wyeth fails to expound on its argument so as to challenge the admissibility of the underlying documents, the court cannot make a final ruling on this challenge to Hayes' testimony.  So long as the underlying document is properly admitted into evidence, Hayes is permitted to read from it.  Accordingly, as was determined on the similar issue with regard to Avorn's testimony, the motion to limit this portion of Hayes'

testimony is denied, but the defendant is granted leave to reassert this challenge following determination of the admissibility of the underlying documents.

The final attack on Hayes' testimony -- that he used the non-regulatory term "medically serious" in a regulatory context -- requires further attention.  At the outset, the court notes that this challenge, while couched in the language of *Daubert*, is in reality a FED. R. EVID. 403 challenge.  *See* PTO 1685, 2001 WL 454586, at *3.  That is, Wyeth is arguing that using the term "medically serious" will confuse or mislead the jury because Hayes offers testimony regarding FDA regulations and the FDA defines the term "serious".  Motion to Limit Generic Experts at 16.  The court is inclined to agree with the plaintiff on this issue.  While the use of the phrase "medically serious" may create some amount of confusion for the fact finder, there is no reason that this confusion cannot be eliminated through cross-examination. Therefore, the motion to limit this portion of Hayes' testimony is denied.

6.  *Testimony of James Oury*

In her notice of expert testimony, the plaintiff indicated an intent to call James Oury.  However, in her response, Burton stipulates that she no longer intends to call this witness.  *See* Response on Generic Experts at 1.  Accordingly, the court will not address Wyeth's challenges to his testimony.

- 16 -

7.  *Testimony of Barry Sears*

Dr. Barry Sears ("Sears") has a Ph.D. in biological chemistry with a background in the study of the molecular structure of lipids and the role of lipids in artherosclerosis.  Motion to Limit Generic Experts at 21.  Wyeth asks the court to exclude the testimony of Sears to the extent that he would testify about (1) whether Pondimin and Redux met the efficacy requirements of the FDA; and (2) Wyeth's disclosure requirements and marketing obligations.  *Id.* at 21-22.  Burton stipulates that she will not call on Sears to testify regarding either of these two matters.  *See* Response on Generic Experts at 7.  Again, the transferee court also excluded these two areas of testimony.  *See* PTO 1685, 2001 WL 454586, at *23-24 ("Dr. Sears clearly lacks the qualifications and methodology to opine about whether Redux met FDA efficacy criteria" and "Dr. Sears is also unqualified to opine about [Wyeth]'s marketing efforts and disclosure obligations").

However, Burton does note that she may call Sears to testify about the effectiveness of Pondimin and Redux in treating obesity -- an area for which the transferee court found Sears' testimony to be admissible.  See *id.* at *23.  In light of these stipulations and PTO 1685, the court finds that no further discussion regarding Sears' testimony is necessary.  Accordingly, Wyeth's motion to limit Sears' testimony regarding whether Pondimin and Redux met the FDA efficacy requirements and regarding the marketing obligations of Wyeth is denied as moot.

### B.  Motion to Exclude the Testimony of Michael P. Elkin

Under Texas law, one factor for consideration by the jury when assessing punitive damages is the net worth of the defendant.  *See* TEX. CIV. PRAC. & REM. CODE § 41.011(a)(6).  Wyeth previously designated Patrick A. Gaughan ("Gaughan"), Ph.D., to serve as an expert witness to testify at trial regarding the net worth of Wyeth.  The plaintiff designated Michael P. Elkin ("Elkin"), a certified public accountant ("CPA"), as a rebuttal witness on the issue of punitive damages.  As best the court can ascertain, Wyeth does not challenge Elkin's testimony to the extent that his calculations of net worth may differ from Gaughan's calculations, but rather challenges Elkin's testimony on the ground that he intends to improperly suggest to the jury a range within which to assign punitive damages.  To the extent that Elkin's testimony makes such improper assertions, the court agrees with Wyeth.

There are two specific pieces of information that should be excluded from the evidence:  (1) Elkin's "Schedule of Relevant Financial Measurements," *attached to* Expert Witness Report of Michael P. Elkin ("Elkin Report") *as* Exhibit E, *attached to* Appendix to Wyeth's Motion to Exclude Expert Testimony of Michael P. Elkin *as* Exhibit 1; and (2) Elkin's statement that the jury could "award well in excess of $1 billion without jeopardizing the company's financial condition or ongoing operations," Elkin Report at 5.

With regard to the Schedule of Relevant Financial Measurements, the problem lies not in the calculations or the method through which the figures were arrived at but in the implicit reference to a range of punitive damage amounts for the jury to consider.  The schedule is a simple chart.  On the horizontal axis, Elkin lists several financial measurements for the defendant:  net worth, total assets, working capital, etc.  Wyeth does not object to the values Elkin assigned to each of these measurements.  On the vertical axis, Elkin list the dollar amount of potential punitive damage awards, ranging from $100 million on the low end to $2.5 billion at the other extreme.  The substance of the chart provides the reader with a simple arithmetical calculation -- the proposed punitive damage award listed on the vertical axis is divided by the financial measurement on the horizontal axis.  This calculation produces a schedule of percentages so that the user could choose a number along the vertical axis and convert it to a percentage of the various financial measures.  For example, the schedule illustrates that a punitive damage award of $500 million would be equal to 3.4 percent of Wyeth's net worth, 1.4 percent of Wyeth's total assets, and 13.7 percent of Wyeth's net income.

To the extent that this schedule provides various financial measurements, the court finds no fault.  To the extent that this schedule provides the jury with an illustration of how to ascertain percentages, again the court finds no fault.  But to the extent that the schedule suggests to the jury that it should assess a punitive damage

award (if any) in the range of $100 million to $2.5 billion the schedule is wholly prejudicial.  See *Voilas v. General Motors Corporation*, 73 F. Supp. 2d 452, 463-65 (D.N.J. 1999) (finding that expert testimony outlining three methods of calculating punitive damages and a range of punitive damage awards "carries the risk of swaying and misleading the jury into the erroneous belief that it is limited to one of the three methods and ranges of damages outlined").  As best the court can determine, Elkin merely chose these numbers, among others, because they "appeared" to him to be "significant" percentages.  *See* Deposition of Michael P. Elkin at 22:19-23:21 (stating that he chose $100,000,000 as the smallest denomination because it was the first amount to be financially significant and defining "financial significance" as "[a]n amount that when compared to other categories appears to be significant"), *attached to* Wyeth's Supplemental Appendix in Support of Reply Briefs *as* Exhibit 14.  With all due respect to Elkin, his unsupported opinion, without more, does not constitute a proper basis for expert testimony.

The second objectionable portion of Elkin's report -- that a $1 billion award of punitive damages will have no affect on Wyeth -- is a similarly improper form of expert testimony.  In *Hayes v. Walmart Stores, Inc.*, 294 F. Supp. 2d 1249 (E.D. Okla. 2003), the district court excluded expert testimony regarding the economic impact of certain amounts suggested by the plaintiff's expert economist.  See *id.* at 1249-50. The *Hayes* court held that economic impact testimony was unreliable under the

*Daubert* factors because such conclusions "ha[ve] not been tested or subjected to peer review, ha[ve] no known error rate and ha[ve] not been accepted in the community of economists." *Id.* at 1251-52.  In the instant case, Elkin's report states, "Based upon my review and analysis Wyeth has more than adequate resources to pay a punitive award well in excess of $1 billion without jeopardizing the company's financial condition or ongoing operations."  Elkin Report at 5.  He does not state how he came to the conclusion that such an award would not jeopardize the company's financial condition and in response to the motion to exclude such testimony, Burton provides no further elaboration.  The court cannot allow such random speculation to be presented to the jury under the guise of expert testimony.

In addition to these two specific challenges to Elkin's testimony, Wyeth argues that his entire testimony should be stricken because under *State Farm v. Campbell*, 538 U.S. 408 (2003), and *BMW of North America, Inc. v. Gore*, 517 U.S. 559 (1996), the introduction of evidence regarding Wyeth's net worth is unconstitutional.  As stated previously, TEX. CIV. PRAC. & REM. CODE § 41.011(a)(6) provides that the net worth of the defendant is a relevant factor when determining punitive damages.  Wyeth's argument in this respect comes from an overly broad reading of *State Farm* and *Gore*. The main point of Wyeth's confusion on the issue stems from the fact that it attempts to read *State Farm* and *Gore* as placing restrictions on the admissibility of evidence.  However, neither *State Farm* nor *Gore* addressed the factual question of

- 21 -

what amount of punitive damages can be awarded; rather, these cases imposed a gatekeeping function on the trial court to limit as a matter of law the amount of punitive damages awarded.

In *State Farm*, the Supreme Court articulated several factors for the court to consider when determining if the jury's assessment of punitive damages violated the defendant's right to due process.  538 U.S. at 418.  "Courts reviewing punitive damages [are] to consider three guideposts:  (1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases."  *Id.* (citing *Gore*, 517 U.S. at 575).  The only command with any relation to an evidentiary issue that can be gleaned from *State Farm* comes via its prohibition on allowing a jury in one state to use punitive damages to punish a defendant for conduct committed out-of-state, *see* 538 U.S. at 421-22, and requiring that the jury base its award of punitive damages on the defendant's wrongful conduct only as it relates to the specific conduct giving rise to the plaintiff's underlying claims, see *id.* at 422-23.

It is true that both *Gore* and *State Farm* warn that the "presentation of evidence of a defendant's net worth creates the *potential* that juries will use their verdicts to express biases against big businesses, particularly those without strong local

- 22 -

presences." *Id.* at 417 (quoting *Honda Motor Company v. Oberg*, 512 U.S. 415, 432 (1994)) (emphasis added).  However, neither case requires the exclusion of such evidence.  In fact, the *State Farm* majority cited Justice Breyer's concurring opinion from *Gore* in which he wrote, "[Wealth] provides an open-ended basis for inflating awards when the defendant is wealthy. . . .  *That does not make its use unlawful or inappropriate*; it simply means that this factor cannot make up for the failure of other factors, such as 'reprehensibility,' to constrain significantly an award that purports to punish a defendant's conduct."  *Campbell*, 538 U.S. at 427-28 (quoting *Gore*, 517 U.S. at 591 (Breyer, J., concurring)) (emphasis added); see also *Horney v. Westfield Gage Company, Inc.*, 77 Fed. App'x 24, 35 (1st Cir. 2003) ("Nothing in [*State Farm*] stands for the proposition that the burden should not be placed on the defendant to decide whether to submit evidence of its financial condition so that it may limit the punitive damages award."); *Lowry's Reports, Inc. v. Legg Mason, Inc.*, 302 F. Supp. 2d 455, 461 (D. Md. 2004) (allowing evidence of the defendant's net worth).

This court refuses to declare unconstitutional the provision of the Texas statutes permitting the consideration of net worth.  While the court takes note of the concern expressed by the Supreme Court in *State Farm* and *Gore* about the use of net worth as a factor in deciding whether or not to award punitive damages, that concern is mitigated by the Supreme Court's own recognition of the usefulness of such a measure and the trial court's role in reviewing the constitutionality of any such

punitive damage award.  Accordingly, to the extent Wyeth seeks to exclude Elkin's testimony in its entirety, the motion is denied.

Thus, the defendant's motion to exclude these two specific sections of Elkin's testimony regarding his suggestion of a range of jury awards and his opinion on the potential economic impact of a specific punitive damage award is granted.  However, to the extent the defendant seeks to exclude the remainder of Elkin's testimony, the motion is denied.

### III.  CONCLUSION

For the reasons stated above, the defendant's motion to limit the testimony of plaintiff's generic experts is **DENIED**.  The defendant's motion to exclude the expert testimony of Michael P. Elkin is **GRANTED** in part and **DENIED** in part.

**SO ORDERED**.

April 5, 2007.

A. JOE FISH
CHIEF JUDGE